```
             UNITED STATES DISTRICT COURT
                DISTRICT OF MINNESOTA
              CIVIL NO. 21-123(DSD/DTS)
```

Tanya Moryn,

        Plaintiff,

v.   **ORDER**

G4S Secure Solutions (USA), Inc.

        Defendant.

    Beth E. Bertelson, Esq. and Bertelson Law Offices, PA, 333 Washington Avenue North, Suite 402, Minneapolis, MN 55401, counsel for plaintiff.

    Kelly Eisenlohr-Moul, Esq. and Martenson Hasbrouck & Simon, LLP, 2573 Apple Valley Road NE, Atlanta, GA 30319, counsel for defendant.

This matter is before the court upon the motion for summary judgment by defendant G4S Secure Solutions (USA), Inc. Based on a review of the file, record, and proceedings herein, and for the following reasons, the defendant's motion is denied.

## BACKGROUND

This dispute arises out of G4S's termination of plaintiff Tanya Moryn's employment. G4S provides security services to its customers at client sites. Marmon Decl. Ex. C, at 1:4. G4S hires and trains security guards and places them at customer locations. Id. at 1:5. The company also has corporate offices, in which

employees manage client relationships and provide support to its security guard employees. Id. at 2:7-9.

Moryn began working at G4S as an administrative assistant in May 2007. Moryn Dep. at 137:3-39:7. At the time she was hired and throughout her time at G4S, Moryn did not have a college degree or any formal training other than the on-the-job training she received from G4S. Id. 22:1-23:1. In her thirteen years at the company, Moryn received three performance reviews, all of which were positive. Ostapowich Decl. Exs. 3, 4, 5. Moryn never received any formal discipline or warnings for poor job performance. Chivinski Dep. at 63:9-16; Moryn Dep. at 132:1-7. In fact, Moryn was promoted over time to positions of increasing responsibility, first to Human Resources Specialist in 2011 and then to HR Manager for the Minneapolis office in 2016. Moryn Dep. at 138:7-40:14.

In spring 2019, G4S reorganized. Chivinski Dep. at 70:10-72:24. After the reorganization, G4S affirmed Moryn's employment and extended a new offer letter that confirmed her continuing role as HR Manager. Ostrapowich Decl. Ex. 11. In the months following the reorganization, Moryn received positive comments regarding her work on various projects. Ostrapowich Decl. Exs. 12-17.

According to G4S, however, these facts obscure Moryn's actual job performance. For example, Moryn's department failed a 2017 internal audit, and a follow-up audit, because the personnel files

it maintained were not compliant with federal law and client contractual requirements. Moryn Dep. at 169:22-186:22. Additionally, in fall 2019, Moryn received a complaint that the Minneapolis office's operations manager made inappropriate comments about another employee. Id. at 191:20-196:3. Instead of investigating or reporting it as required by protocol, Moryn immediately informed the victim employee of the comments. Id. After this incident, Moryn's supervisors reprimanded her for failure to follow protocol. Id. at 195:9-96:15; Chivinski Dep. at 59:13-60:1. G4S contends that these failures led Moryn's supervisors to question whether she should continue in her role. Marmon Dep. at 22:6-29:1. G4S did not, however, apply its progressive discipline policy[1] to Moryn or take any other formal steps at that time. Chivinski Dep. at 99:12-103:16.

In the spring of 2020, around the same time that G4S claims it was re-evaluating her performance, Moryn approached Chivinski and told him that she had been experiencing significant anxiety. Moryn Dep. at 84:18-86:21. Moryn requested time off, but Chivinski denied the request. Id.; Dolan Dep. 43:10-44:9. Then, on June 5, 2020, Moryn suffered a panic attack and sought medical care. Moryn Dep. at 230:22-32:21. In addition to persistent anxiety, Moryn

---

[1] It is unclear whether the progressive discipline policy formally applied to Moryn as a corporate employee or whether its use in her case was discretionary. Chivinski Dep. at 100:7-101:13.

3

reported difficulty concentrating, focusing, and sleeping. Id. at 69:5-19, 231:1-20, 107:14-24; Ostapowich Decl. Ex. 18. Moryn's doctor diagnosed her with depression and anxiety and prescribed her anxiety medication. Moryn Dep. at 231:1-20, 107:14-24; 232:10-13; 233:19-24; Ostapowich Decl. Ex. 18.

That same day, Moryn emailed Chivinski and Chad Tancil, the vice president of the Chicago market, to request medical leave beginning on Monday, June 8. Ostrapowich Decl. Exs. 2, 19. G4S did not immediately respond. Id. Ex. 20. On Thursday, June 11, Moryn again emailed Chivinski to request medical leave. Id. G4S then granted her request. Id. Ex. 21. Moryn's leave was set to run through August 31, 2020. Chivinski Dep. 124:9-25:1.

G4S claims, however, that it had already made the decision to terminate Moryn at that time.[2] Marmon Dep. at 22:6-25; Chivinski 127:17-28:22. According to G4S, Chivinski was set to travel to Minneapolis to terminate Moryn in person in late May, but the trip had to be postponed in light of the ongoing unrest in Minneapolis after the death of George Floyd. Marmon Dep. 23:10-20; Chivinski Dep. at 128:4-18.

G4S contends that it delayed Moryn's termination after she requested leave so that she would have the full benefits of medical

---

[2] Although it was suggested by at least one person, G4S did not consider moving Moryn to a different role, despite openings in related departments, because it felt it needed a "clean break." Chivinski Dep. at 140:17-41:19.

4

leave. Ostrapowich Decl. Ex. 31. Instead of moving ahead with the termination, G4S split Moryn's duties among several people, including Heather Picolo, the head of HR for the Wisconsin region, Chivinski, and temporary employees. Chivinski 126:16-27:14. Chivinski contacted Moryn about work duties both by phone and email several times during her leave. Moryn Dep. at 228:12-14; Ostrapowich Decl. Exs. 32, 33, 34, 35, 36. At no point before or during her leave, however, did G4S indicate to Moryn that her job was in jeopardy. Moryn Dep. at 223:21-24:11.

As her leave was winding down, Moryn sought a modification to her return-to-work plan. Ostrapowich Decl. Ex. 22. On August 31, Moryn presented a doctor's note to HR requesting that she be permitted to return to work on September 9 and begin by working three days per week for the first two weeks and increasing to full-time over the following two weeks. Id. Ex. 23; Chivinski Dep. at 136:18-37:13.

On September 1, however, Chivinski contacted Moryn to set up a call with Patricia Marmon, the Vice President of HR. Ostrapowich Decl. Ex. 26. During the September 2 call, Chivinski told Moryn that her request for additional leave and an initial part-time schedule could not be accommodated and that her employment was being terminated. Chivinski Dep. at 142:3-23; Moryn Dep. at 131:9-14. G4S offered Moryn a severance of $20,211.12. Marmon Decl. Ex. C, at 7:38.

On September 4, Chivinski emailed Moryn to ask whether she was going to sign the severance agreement. Ostrapowich Decl. Ex. 30. Moryn replied to the email on September 7 and told Chivinski that she believed she was being "adversely treated" and retaliated against because of her recent leave. Id. Chivinski responded by email on September 18. Id. Ex. 31. He reiterated G4S's decision to terminate Moryn's employment, emphasized the need for an HR manager who can handle a "stressful and unpredictable environment," and for the first time, told Moryn that G4S had made the decision to fire her on May 28, 2020, due to performance issues. Id.

Based on these events, Moryn filed this lawsuit, bringing claims for retaliation under the Family and Medical Leave Act (FMLA); for disability discrimination, failure to accommodate, and retaliation under the Minnesota Human Rights Act (MHRA); and for failure to pay owed compensation for earned paid time off in violation of Minnesota Statute § 181.13. G4S now moves for summary judgment on all claims. Moryn agrees to voluntarily dismiss her failure to pay owed compensation claim but opposes summary judgment on all of her other claims.

**DISCUSSION**

**I.   Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material only when its resolution affects the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that it could cause a reasonable jury to return a verdict for either party. See id. at 252.

On a motion for summary judgment, the court views all evidence and inferences in a light most favorable to the nonmoving party. See id. at 255. The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings but must set forth specific facts sufficient to raise a genuine issue for trial. See Celotex, 477 U.S. at 324. A party asserting that a genuine dispute exists - or cannot exist - about a material fact must cite "particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A). If a plaintiff cannot support each essential element of a claim, the court must grant summary judgment because a complete failure of proof regarding an essential element necessarily renders all other facts immaterial. Celotex, 477 U.S. at 322-23.

**II. Legal Framework**

Moryn's retaliation and disability discrimination claims are evaluated under the burden-shifting framework laid out in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See Sisk v. Picture People, Inc., 669 F.3d 896, 899 (8th Cir. 2012) (FMLA retaliation); Hoover v. Norwest Priv. Mort. Banking, 632 N.W.2d 534, 542 (Minn. 2001) (MHRA disability discrimination); Stockton v. Northwest Airlines, 804 F. Supp. 2d 938, 951-52 (D. Minn. 2011) (MHRA retaliation).

Under this framework, a complainant "carr[ies] the initial burden ... of establishing a prima facie case" that the employer acted unlawfully. McDonnell Douglas Corp., 411 U.S. at 802. "The burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for its action. Id. If the employer meets this burden, the complainant then must "be afforded a fair opportunity to show that [the employer's] stated reason ... was in fact pretext." Id. at 804.

Pretext can be shown in two ways. "First, the employee can show that the employer's proffered explanation has no basis in fact." Hite v. Vermeer Mfg. Co., 446 F.3d 858, 867 (8th Cir. 2006) (citation omitted). This route involves challenging the factual claims underlying the employer's explanation. Wallace v. DTG Operations, Inc., 442 F.3d 1112, 1120-21 (8th Cir. 2006). Alternatively, the employee may show that a prohibited "reason

8

more likely motivated the employer." Id. at 1120. A plaintiff pursuing this route "may concede that the proffered reason ... would have been a sufficient basis for the adverse action" but argue "that the employer's proffered reason was not the true reason for the action." Id. at 1121.

### III. FMLA Retaliation Claim

Under the FMLA, eligible employees may take up to twelve "workweeks of unpaid leave during any 12-month period." 29 U.S.C. § 2612. Employers are prohibited from discriminating or retaliating against employees who assert their FMLA rights. 29 U.S.C. § 2615(a)(2). "Basing an adverse employment action on an employee's use of leave ... is therefore actionable." Smith v. Allen Health Sys., Inc., 302 F.3d 827, 832 (8th Cir. 2002).

"To establish a prima facie case of FMLA retaliation, an employee must show that she engaged in activity protected under the Act, that she suffered an adverse employment action by the employer, and that a causal connection existed between the employee's action and the adverse employment action." Darby v. Bratch, 287 F.3d 673, 679 (8th Cir. 2002) (citation omitted). There is no dispute that Moryn engaged in protected activity by taking FMLA leave or that she suffered an adverse employment action when her employment was terminated. The question, then, is whether a causal connection exists between the protected activity and adverse action.

9

To establish a causal link, Moryn must show that the "employer's retaliatory motive played a part in the adverse employment action." Kipp v. Mo. Highway & Transp. Comm'n, 280 F.3d 893, 897 (8th Cir. 2002) (citation and internal quotation marks omitted). "An employee can establish a causal link between her protected activity and the adverse employment action through 'the timing of two events.'" Hite, 446 F.3d at 866 (citation and internal quotation marks omitted). "The mere coincidence of timing, however, is rarely sufficient to establish the causation element." Id. (citation omitted). If "temporal proximity alone is insufficient to establish causation, the employee may attempt to prove causation by providing evidence of the employer's discriminatory comments." Id. (citing Watson v. O'Neill, 365 F.3d 609, 613 (8th Cir. 2004)).

Moryn relies both on the timing of her termination and G4S's initial explanation of her termination to establish a causal connection. First, she notes that her termination occurred only days after her FMLA leave ended and immediately after requesting additional leave. Second, Moryn points to G4S's comments during the phone call terminating her employment, which suggested that she was being fired because she requested additional leave in the form of a temporary part-time schedule. G4S counters that terminating Moryn three months after she initially requested leave is not close enough in time to establish a causal connection.

10

Further, G4S argues that the decision to terminate Moryn was made in May 2020, prior to her leave request.

The court agrees with Moryn. First, Moryn's firing only days after requesting additional leave is sufficient for the purposes of a prima facie case. Second, Moryn has created a genuine dispute about the timing of G4S's decision to terminate her employment. Moryn was never told that her performance was deficient or that her job was in jeopardy. The initial explanation for Moryn's termination was G4S's need for a full-time HR Manager and Moryn's perceived inability to handle the workload because she requested additional leave. It was only later that Moryn was told that performance issues played a part in the decision. This evidence, suggesting that Moryn's termination was, at least in part, due to her absence and request for a temporary part-time schedule, combined with the temporal proximity to her leave sufficiently establishes a causal connection.

Next, to meet its burden of proffering a non-discriminatory reason for its actions, G4S argues that it terminated Moryn because of performance issues and a lack of professionalism. To support its argument, G4S relies, primarily, on evidence of failed internal audits and an improperly handled HR complaint. Based on this evidence, G4S has met its burden at this stage.

At the final stage, Moryn must show that G4S's explanation is merely pretext. Here, Moryn does not challenge G4S's underlying

11

factual claims but argues that they were not the real reason for her termination.

First, as already discussed, Moryn questions G4S's contention that it decided to terminate Moryn in May 2020 and notes that there is no contemporaneous record of this decision. See Simons v. Midwest Tel. Sales & Serv., 462 F. Supp. 2d 1004, 1009 (D. Minn. 2006) (discounting defendant's explanations due, in part, because they were undocumented). Moryn also points out that, if G4S had decided to terminate her, it could have done so over the phone, as it eventually did in September 2020.

Second, Moryn argues that G4S has provided shifting reasons for her termination. "An employee may prove pretext by demonstrating that ... the employer changed its explanation for why it fired the employee." Stallings v. Hussmann Corp., 447 F.3d 1041, 1052 (8th Cir. 2006) (citation omitted). During the phone call in which Moryn was terminated, Chivinski told her that she was being terminated because the position demanded a full-time employee who would be in place immediately. Later, Chivinski raised the notion of performance issues, but only after Moryn expressed concerns about her termination. Finally, only after this litigation began did G4S cite Moryn's perceived lack of professionalism as a reason for her termination.

Third, Moryn argues that G4S failed to follow its progressive discipline policy when it terminated her. Pretext may be shown by

demonstrating that "the employer deviated from its policies." Id. Although it is unclear whether G4S's progressive discipline policy officially applied to Moryn, there is no dispute that G4S failed to document or communicate any performance issues throughout her time at the company. Further, even if the policy did not officially apply, Chivinski stated that corporate employees should receive progressive discipline "where possible." Chivinski Dep. at 101:7-13. G4S also admits that, absent serious misconduct, it typically did not terminate employees without any intervention or coaching attempts.

The court finds that Moryn has established a genuine dispute of material fact as to whether G4S's explanation is pretextual and that it actually terminated her in retaliation for requesting FMLA leave. Moryn highlights gaps or inconsistencies in G4S's explanation of her termination, and the court agrees that it is unclear when and why G4S decided to terminate Moryn. These questions must be decided by the factfinder. Accordingly, summary judgment on this claim is denied.

**IV. MHRA Disability Discrimination**

The MHRA prohibits employment discrimination based on, among other things, disability. Minn. Stat. § 363A.02 subd. 1(a)(1). "To establish a prima facie case of disability discrimination under the MHRA, [a plaintiff] must show (1) she has a disability within the MHRA, (2) she is qualified to perform the essential functions

13

of her job, with or without reasonable accommodation, and (3) she suffered an adverse employment action because of her disability."[3] Liljedahl v. Ryder Student Transp. Servs., Inc., 341 F.3d 836, 841 (8th Cir. 2003) (citation omitted).

First, Moryn argues that she is disabled within the meaning of the MHRA.  Under the MHRA, "[a] disabled person is any person who (1) has a physical, sensory, or mental impairment which materially limits one or more major life activities; (2) has a record of such an impairment; or (3) is regarded as having such an impairment."  Minn. Stat. § 363.03, subdiv. 12.  Moryn claims that her anxiety and depression materially limit her ability to concentrate, focus, and sleep.  She also notes that there is a record of her impairment because she has been treated by medical professionals for these conditions, sees a therapist, and takes prescribed medication.  The court agrees that Moryn is disabled within the MHRA definition.

Next, Moryn argues that she is qualified to perform the essential functions of her job.  To establish qualification, "a plaintiff need only establish that she met the minimum objective

---

[3] The parties dispute whether Moryn must show that she was replaced by a non-disabled individual as an element of her claim. There is conflicting case law on this issue.  Compare Hoover, 632 N.W.2d at 542 (requiring plaintiffs to show they were "replaced by a non-member of the protected class."), with Liljedahl, 341 F.3d at 841 (containing no such requirement).  Because the controlling Eighth Circuit cases do not require plaintiffs to make this showing, the court does not require it in this case.

14

qualifications for the job." Hoover, 632 N.W.2d at 544 (citations omitted).  Here, Moryn held her job since 2016, received a re-confirmation of the role in 2019, and received positive reviews in all of her official performance evaluations.  Although G4S claims that Moryn could not perform the essential functions of the job as a part-time employee, Moryn did not request permanent part-time status.  Moryn requested an initial part-time schedule in which to re-acclimate to her work environment.  According to Moryn, with this accommodation, she could have fully resumed her duties within weeks.  Thus, Moryn has successfully established that she was qualified to perform the essential functions of her job.

Finally, it is undisputed that Moryn suffered an adverse action when she was terminated.  Therefore, Moryn has established a prima facie case of MHRA disability discrimination.

Next, G4S must proffer a legitimate, non-discriminatory reason for its action.  As already discussed, G4S's explanation that it fired Moryn for performance issues meets its burden.

To demonstrate that G4S's explanation is pretextual and that she was actually fired because she suffered from anxiety and depression, Moryn puts forth many of the same arguments and evidence as before, such as the shifting explanations for her termination, the timing of her termination immediately after requesting accommodations, and G4S's failure to follow its policies.  For this claim in particular, Moryn emphasizes that

15

Chivinski explained to Moryn that she was being terminated because she appeared unable to handle the demands of her stressful and unpredictable job.

Again, the court agrees that Moryn has established factual disputes about the timing of and reason for her termination. Moreover, the court finds that G4S's initial explanation that it needed someone who could handle a stressful environment - after Moryn admitted to suffering from anxiety - suggests that its current explanation of her termination as performance-based is pretextual. Combined with the other issues related to the credibility of G4S's explanation addressed previously, these facts raise questions properly left to the factfinder. Therefore, summary judgment on this claim is denied.

**V.   MHRA Retaliation**

The MHRA also prohibits employers from retaliating against employees who request a reasonable accommodation for a disability. Minn. Stat. § 363A.15. To establish a prima facie case of MHRA retaliation, Moryn must show that she engaged in protected conduct, suffered an adverse employment action, and a causal link exists between the adverse action and the protected conduct. Stockton, 804 F. Supp. 2d at 951.

Here, again, there is no dispute that Moryn engaged in protected conduct by requesting an accommodation or that her termination was an adverse action. Thus, the question is whether

16

there is a causal link between those two events. As in the FMLA context, Moryn relies primarily on the timing of her termination immediately after requesting accommodations to support her claim. Here, Moryn presented a doctor's note to G4S on August 31 that requested that her return to work include an initial part-time schedule. She was terminated on September 2. With such a short period of time between these two events, Moryn has established a prima facie case of discrimination. See Wallace, 415 F.3d at 859.

Again, G4S claims that it terminated Moryn due to performance issues. This meets its burden to provide a legitimate, non-discriminatory reason for the adverse action.

For the same reasons as discussed previously, Moryn argues that G4S's reason is pretextual. Again, the court agrees that there is a sufficient factual dispute as to whether G4S's actual reason was discriminatory. Therefore, summary judgment on this claim is denied.

**VI.  MHRA Failure to Accommodate**

The MHRA requires employers to "make reasonable accommodation to the known disability of a qualified disabled person ... unless the employer ... can demonstrate that the accommodation would impose an undue hardship." Minn. Stat. § 363A.08, subd. 6(a). For this claim, Moryn must demonstrate that G4S "knew of, and

failed to reasonably accommodate," her disability.[4]  Kammueller v. Loomis, Fargo & Co., 383 F.3d 779, 784 (8th Cir. 2004).  Reasonable accommodations may include modified work schedules or reassignment to a vacant position.  Minn. Stat. § 363A.08, subdiv. 6(a) (2021).  In considering whether an accommodation would be an undue hardship, courts look at the number of employees, the type of operation, the cost of the requested accommodation, and the financial ability to accommodate.  Minn. Stat. § 363A.08, subdiv. 6(b).

Moryn's requested accommodation included an additional five days of leave and three weeks of part-time scheduling before resuming her role full-time.  G4S, however, rejected Moryn's requested accommodation, claiming that it needed a full-time HR manager immediately.  Alternatively, G4S had vacant roles for which Moryn may have been suitable.  Moryn stated that she would have considered taking one of the vacant roles.  G4S acknowledged that it did not consider moving Moryn to another role, because it wanted a "clean break."

Here, there a material question of fact as to whether G4S could have accommodated Moryn.  G4S had covered Moryn's job duties

---

[4] For this claim, Moryn must also show that she is disabled within the meaning of the MHRA; was qualified to perform the essential functions of the job, with or without accommodation; and suffered an adverse employment action because of her disability.  See Kammueller, 383 F.3d at 784.  For the reasons discussed under her MHRA disability discrimination claim, Moryn has made this showing.

during her leave and continued to do so until a full-time replacement was hired, which happened after Moryn would have already returned to full-time work. Further, the statute specifically states that reassignment to a vacant position is a reasonable accommodation. Thus, a jury could find that Moryn's request for a temporary part-time schedule was reasonable and could be accommodated. A jury could also find that moving Moryn into another role would have reasonably accommodated her needs. Therefore, summary judgment is denied.

## VII. Paid Time Off Payout

Finally, Moryn brought a claim for owed compensation related to her unused paid time off. Based on the facts uncovered during discovery, Moryn now agrees to abandon this claim. Accordingly, the claim is dismissed.

## CONCLUSION

Accordingly, based on the above, IT IS HEREBY ORDERED that:

1. Plaintiff's claim for failure to pay for owed PTO under Minn. Stat. § 181.13 is dismissed; and

2. Defendant's motion for summary judgment [ECF No. 31] is denied.

Dated: June 28, 2022

s/David S. Doty<br>
David S. Doty, Judge<br>
United States District Court